CITIES SERVICE OIL CO. v. GEOLOGRAPH CO., Inc.

No. 35084.    March 10, 1953.

*254 P. 2d 775.*

L. L. Corn, Gentry Lee, F. H. Bacon, and R. O. Mason, Bartlesville, for plaintiff in error.

Monnet, Hayes & Bullis and Mart Brown, Oklahoma City, for defendant in error.

PER CURIAM. Plaintiff in error was plaintiff in the trial court and defendant in error was defendant. They will be referred to as they appeared in the court below.

Plaintiff sought recovery from defendant on a written contract, claiming there was due and owing by reason of same, a substantial sum as "overriding royalty" payments based on annual "gross rentals" received by defendant for the year ending June 30, 1949, on a certain patented device, known by its registered trade-mark as a "Geolograph", and used for recording drilling operations.

Defendant joined issue by answer admitting the execution of said contract, but denying that there is any indebtedness due plaintiff for the period in question. By cross-petition defendant set up a counterclaim for overpayments allegedly made to plaintiff due to what defendant contends was a mistake in calculating and paying royalty for past years.

It appears that on or about November 6, 1942, plaintiff sold to P. B. Nichols, the share which it had owned jointly with him in the letters patent and the registered trade-mark on the "Geolograph," and in addition Nichols acquired plaintiff's interest in the business of manufacturing and renting the "Geolographs". The terms of sale and property sold were all set out in a written contract, and that contract, as amended and supplemented at different times, is looked to by each of the parties to this action as controlling.

Nichols acquired plaintiff's interest in the letters patent; the registered trade-mark "Geolograph"; a certain license and option agreement which had been taken as protection against possi-

ble claims of infringement by reason of outstanding letters patent running in the name of one George P. Mizell; certain geolograph machines then in existence; the amounts due and owing or to become due and owing to a certain joint account covering business operations after the close of business on September 30, 1942; and all other property of a personal nature used or kept for use in connection with the conduct of the joint adverture.

As full consideration plaintiff received primary payment and, in addition thereto, was to receive certain royalty pursuant to paragraph 7 (b) of the agreement which originally provided:

"*Royaltys* Company shall receive and be paid by Nichols during the life of said Patent an overriding royalty based on gross rentals received on said Geolographs. All calculations of gross rentals to be less any sales tax charged and collected. The overriding royalty payable hereunder shall be computed and paid according to the following schedule:

"Gross Rentals Annually:

"$0 to $6,000.00, no royalty.

"$6,000.00 to $10,000.00 5% royalty, on excess over $6,000.00.

"$10,000.00 to $15,000.00, 7½% on excess over $10,000.00.

"For all gross rentals in excess of $15,000.00, 10%."

Provision was further made by the contract that in event of the sale of machines covered by the agreement, or should Nichols engage in the business of manufacturing and selling Geolographs, then during the life of the patent plaintiff was to receive as royalty on any machines sold 10% of the sales price, said price to be not less than $750.

It was further agreed that the going business was to be carried on by Nichols in a good and workmanlike manner and he was to use his best endeavors to make the business profitable and successful.

Subsequently, and on the 8th day of July, 1943, the contracting parties modified the schedule of royalty payments provided by subparagraph (b) of paragraph 7 of the original agreement as follows:

"Gross Rentals Annually:

"$0 to $6,000.00, no royalty.

"$6,000.00 to $50,000.00 5% royalty on excess over $6,000.00.

"For all gross rentals in excess of $50,000.00, 10%."

On September 15, 1947, the contract was further amended by changing the accounting date for royalties due and, in addition, to provide that plaintiff was to receive a royalty of 30% on rentals paid by its contractors for use of the "Geolograph" on wells drilled for plaintiff as operators of the property but the same not to be included when computing "gross rentals" under subdivision (b) of paragraph 7.

In 1947, the business was incorporated under defendant's name, Nichols continuing as one of the principal owners of the business and serving the corporation as its president. The corporation assumed the contract and the royalty payments were continued as in the past until this controversy arose in connection with the royalty for the year ending June 30, 1949. All that is here in dispute concerns royalty payments to be made under subdivision (b) of paragraph 7.

Plaintiff contends that it was the intention of the parties by their contract that plaintiff should be paid royalty, to be computed on the gross rentals received in excess of the first $6,000 without any deductions, except the sales tax. It further contends that the phrase "Gross rentals received on said Geolographs" meant not only the rentals from the Geolographs in existence and sold pursuant to the contract, but included gross rentals received on Geolographs manufactured in the future during the life of said patent.

Defendant's position is that royalties are payable only on gross rentals received from users of the "Geolographs" in existence when the contract was made and sold by plaintiff to Nichols; that gross rentals on which royalties were payable included all sums paid for the use of the Geolographs, but do not include sums paid for services rendered by defendant in connection with servicing and installing the Geolographs.

The cause was tried to the court which found for the defendant and held that the royalty was to be paid on the Geolographs in existence at the time of contracting and that said royalty is to be computed on rentals less installation and servicing expenses. The trial court found and held that 50% of the money received by defendant should have been charged to rentals and 50% to expenses.

The proper interpretation to be put upon the words "overriding royalty", "gross rentals", and "Geolographs" is controlling. If those words are to be interpreted as plaintiff contends and as they have operated in the past the payments made were proper and the amount which plaintiff seeks to recover by its petition is due it. If, as the trial court ruled, defendant's interpretation is correct, then plaintiff has money which it has received from defendant as the result of mistake and has no right to retain it, defendant having made due and proper demand for its return.

Although counsel for the respective parties are on record by their opening statements as stipulating and agreeing that the contract is not ambiguous, depending upon which of their viewpoints is found acceptable to the court, there is a wide difference of opinion between them as to what the contracting parties intended the terms "overriding royalty", "gross rentals" and "Geolographs" to mean. This presents a justiciable controversy involving interpretation of a written instrument. What the parties ask, is that the court give effect to their language.

The law requires that a contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful. 15 O.S. 1941 §152; Texas Co. v. Adelman, 186 Okla. 663, 99 P. 2d 874, 127 A.L.R. 945.

It is an inveterate rule in the interpretation of a written contract that the parties' intentions and purposes, in absence of allegations of fraud, accident, or mistake in making the contract, must be determined from the contract language, subject matter, and relation of the parties. 15 O.S.A. §§152, 163, 164; Cherokee Oil & Gas Co. v. Lucky Leaf Oil & Gas Co., 116 Okla. 121, 242 P. 214; Spring v. Major, 126 Okla. 150, 259 P. 125.

To determine the intention of the parties in making a contract, the court should place itself as far as possible in the position of the parties when the contract was made. Washoma Petroleum Company v. Eason Oil Co., 173 Okla. 430, 49 P. 2d 709.

So, as in every judicial controversy involving a written contract, the interpretation consists of ascertaining the meaning of the words used. Therefore, we must consider the choice of words which the parties employ to express their intent together with all else which appears to be clear and explicit from the contract itself.

If the language is clearly explicit and does not involve uncertainty, the words used are to be understood in their ordinary and popular sense. 15 O.S.A. §154; Romans v. Shannon, 80 Okla. 199, 195 P. 298; Delk v. City Nat. Bank of Duncan, 85 Okla. 238, 205 P. 753.

Where words appear in a contract according to their particular significance as applied to a business or trade under consideration, the special meaning given them by usage must be followed. 15 O.S.A. §§160, 161. Webb v. Woods, 176 Okla. 306, 55 P. 2d 959; Daniel v. Pappas, 93 Okla. 165, 220 P. 355; Broswood Oil Co. v. Sand Springs Home, 178 Okla. 550, 62 P. 2d 1004.

'That which we seek is the thought the words express in keeping with a usage with which the parties to the instant contract are most familiar, along with what the parties reasonably could expect to give or receive in accordance with the terms used. That is to say, we first shall invoke here the viewpoint which will go to show what parties must have intended "overriding royalty" to mean in terms of operative usages of a business in which they were all engaged in one capacity or another.

The record reflects that all persons who handled negotiations and in drawing the contract, including Nichols, were in plaintiff's employment at the time. They were all familiar with the oil and gas business and when using a term of peculiar significance and of common usage with the oil fraternity, such as "overriding royalty", in connection with the controverted words "gross rentals", they must have intended it to express the usage in that industry and to mean something more than a share of the net profit from rentals received on the Geolographs. As so used it must have been the purpose of the parties that rental payments to plaintiff should be free and clear of all cost and expenses unless a contrary intent is clearly expressed that more should be deducted than sales tax.

As defined in 30 Words and Phrases (Perm. Ed.) citing Thornburg v. Cole 201 Okla. 609, 207 P. 2d 1096, 1098:

"An 'overriding royalty' is a certain percentage of the working interest which as between lessee and assignee of mineral lease is not charged with the cost of development or production."

In Cherokee Oil & Gas Co. v. Lucky Leaf Oil & Gas Co., supra, this court observes that use of the word "royalty" in instruments relating to the oil and gas industry shows an intent that the interest conveyed should be free of the usual costs and expenses of development.

When the term "rentals" is used in connection with "gross," as the basis for computing an "overriding royalty," we fail to see on what basis it can be said there exists a clearly expressed intent to authorize deductions other than that specified by the parties which, in this case, was the 2% sales tax.

There can be no doubt that "gross" in its popular sense means whole, entire, total, whether used in connection with rentals, profits, proceeds, sales, receipts, etc.

"Gross sales" as used in a contract providing for the payment of royalties of a certain per cent of the amount of gross sales, was held in 7 Southerland Sisters v. McInnerney, 53 N. Y. Supp. 771, 24 Misc. Rep. 720, to mean actual sales without deducting expenses.

In a lease providing that the "gross earning and receipts" of the railroad leased shall be the basis of computing the rent, the phrase was held to mean the same thing as the receipts of the entire railroad and the property. Cincinnati, S. & C. R. Ry. Co. v. Indiana B. & W. Ry. Company, 44 Ohio St. 287, 315, 7 N.E. 139.

The trial court, in the instant case, placed a restricted meaning on the term "gross rentals" and held that it could not be construed to mean "gross receipts" so as to include rentals, in addition to expenses in connection with the installation, repair and adjustments of "Geolographs" and travel expenses to and from the place of installation.

We think the term must be given a broad rather than a restricted meaning when taken in context, or the use of other words with which it is employed are rendered meaningless. Furthermore, to do as the trial court has done is to give to the term a retrospective rather than a prospective meaning, using the operating experiences and expenses of defendant to supply something which the contract does not show was necessarily within the contemplation of the parties when the contracting. Such is not favored if we are to remain conscious of the court's duty to place it-

self as far as possible in the position of the parties when the contract was made. We think it most important that we endeavor to do so here for as said by the court in Long-Bell Lumber Co. v. National Bank of Commerce, 35 Wash. 2d 522, 214 P. 2d 183, 187, "when money disputes have arisen the perspective is apt to be clouded by the unexpected chance of gain or self-interest".

Back at the time the parties were contracting, the business was in its infancy. Present earnings were not necessarily foreseen. Annual gross rentals up to $6,000 were and are to be royalty free, and we must assume that this was to allow for expenses in part and possibly some profit to the purchaser before accounting to the seller. The first year's operating experience, on the basis of plaintiff's contention, earned for it only $538. Compare this with plaintiff's claimed earnings of $22,858.35 in the sixth year, and one can readily see how the present "perspective is apt to be clouded by the unexpected chance of gain or self-interest".

It is worthy to note also that when Nichols found the contract operating in a way which was not satisfactory to him, there was no reckoning of operating expenses, but the way found to enhance defendant's profit was to adjust downward the royalty on gross rentals by reflecting a substantial reduction in the percentage provided by the original schedule, thereby reducing plaintiff's share in defendant's income.

We find it inconceivable that the parties would have exercised and employed the minute care and detail in writing and thereafter modifying and amending their contract, as the record reflects was done, and yet have left open for a court to determine what one was to pay and the other was to receive as royalty rents, on proof as unsatisfactory as that which appears in this record. Had the parties intended deductions other than the sales tax to to have been made there are enough words in the English language for them

to have made that intent clear by detailing all that was to be deducted in computing plaintiff's royalty. But they said nothing about deductions over and above the sales tax, and this court cannot supply material stipulations or read into the contract words or terms it does not contain. Phoenix Oil Co. v. Mid-Continent Petroleum Co., 177 Okla. 530, 60 P. 2d 1054.

We are impressed with plaintiff's argument, and so hold, that the trial court has made a new contract for the parties when it enlarged upon their language and authorized deductions for installation, repair, and travel expenses. Of course, the court was without power or authority to do this. Phoenix Oil Co. v. Mid-Continent Petroleum Corporation, supra; Phillips v. Henderson Gasoline Co., 101 Okla. 277, 225 P. 668.

The law will not make a better contract than the parties themselves have seen fit to enter into, or alter it for the benefit of one party to the detriment of another. Anthis v. Sullivan Oil & Gas Co., 83 Okla. 86, 203 P. 187.

Much of defendant's argument in its brief concerning the point now under discussion goes to the proposition that to give the words the meaning to which we subscribe would make it impossible for the defendant to operate profitably under the contract and, in effect, defendant made a bad contract.

While we do not agree that the contract as presently written is an onerous one, we think the short answer is that the folly or wisdom of a contract is not for the court to pass on. Even though the contract may seem harsh, it is not the province of a court to change its terms. 17 C.J.S. 742; Gvozdanovic v. McCracken, 172 Okla. 111, 44 P. 2d 1.

Having concluded that the contractual schedule for computing the overriding royalty based on gross rentals received on "Geolographs" should be without any deductions, except the sales tax as provided therein, we next consider whether said royalty is to be com-

puted on gross rentals received on "Geolographs" manufactured following the date of the contract or only on the "Geolographs" in existence and sold to Nichols on that date.

At the outset, it is manifest that the controversy over what "Geolographs" were to enter into the computation of royalty rents could have been averted by sufficient amplification of what was intended by the expression "said Geolographs". This could have been made clear by expressly stating what machines the parties had in mind, or the given number of machines if royalty payments were to be limited to any precise number.

In connection with the foregoing, we are not unmindful of the rule for which defendant contends when it holds the contract is to be construed most strongly against the one who writes it. 15 O.S.A. §170, Kondos v. Stauffer, 180 Okla. 185, 69 P. 2d 338; Smith v. First Nat. Bank, 167 Okla. 408, 29 P. 2d 971; Continental Oil Co. v. Fisher Oil Co. (C.C.A. 10) 55 F. 2d 14.

That rule, however, can apply only where there exists ambiguity. The parties to this action contend that the contract is unambiguous and tried the cause and argued it on that theory in the trial court. While we do not necessarily agree that the language is clear and explicit, it is our purpose to give to the contract such construction as will make it certain and not to change its terms.

It is to be remembered, also, that the rule that a written contract will be interpreted against the person responsible for ambiguity is subservient to the rule requiring references to surrounding circumstances to determine meaning and purpose of the language used by contracting parties. 15 O.S.A. §170. Replogle v. Indian Territory Illuminating Oil Co., 193 Okla. 361, 143 P. 2d 1002.

Keeping in mind the general rules already enunciated herein and others hereinafter cited, we are of the opinion

we have before us once again a matter of giving effect to the language of the parties rather than one of construing an ambiguous contract.

According to our understanding of defendant's contention the term, "said Geolographs", in paragraph 7 (b), relates back to the preceding paragraph where obviously the parties have in mind only those machines in existence on November 6, 1942.

Plaintiff's theory is that, since the transaction involves the sale of going business, the letters patent and the trade-mark, as well as property in existence on the date of the sale, gross rentals are to be paid on all "Geolographs" manufactured during the life of the patent.

These divergent views start us again on a search to determine upon what sense, or meaning of the terms used, the minds of the parties actually met.

And the intention of the parties to a contract is to be gathered from the whole instrument and not from detached portions. 15 O.S.A. §157; Tri-State Cas. Insurance Co. v. Stekoll, 201 Okla. 548, 208 P. 2d 545; Hud Oil & Refining Co. v. Smith, 179 Okla. 412, 65 P. 2d 1011; Levin v. Cook, 84 Okla. 55, 202 P. 299; Lamont Gas & Oil Co. v. Doop & Frater, 39 Okla. 427, 135 P. 392.

The intent of the parties to a contract is to be deduced from the entire contract, and hence where the contract has several provisions, the intent is not expressed by any single clause, but by the several provisions, all of which must be considered together and be so construed as to be consistent with each other. Oklahoma Southern Life Insurance Co. v. Mantz, 191 Okla. 515, 131 P. 2d 70.

The meaning of the word "Geolographs" in connection with its use in other parts of the contract is a significant aid in determining the meaning of the same word in connection with its occurrence in the disputed clause of the written instrument.

Words used in one sense in one part of a contract are deemed to have been used in the same sense in another part of the same instrument, where context does not indicate otherwise. 17 C.J.S. §303, p. 721; Jensen-Salesbery Laboratories, Inc., v. O. M. Franklin Black Leg Serum Co., 74 F. 2d 501; Lyon v. Gray (Tex. Civ. App.) 288 S. W. 545; Chicago Homes for Girls v. Carr, 300 Ill. 478, 133 N. E. 344; American Book Co. v. State, 216 Ala. 367, 113 So. 592.

It is of some significance that "Geolograph" is the trade-mark name of the device subject to letters patent, both of which were included in the sale. It is plain from the contract that the term "Geolograph" when used in other parts of the written instrument referred to the patented device. and not to any particular machine or machines then in existence. To keep the meaning clear, the scrivener, with minute care, when referring to the machines in existence which were the subject of sale, used the expression "machines" and in certain instances specified the same by number. With like care, when describing said machines, they were referred to only parenthetically as "Geolographs", and not as Geolograph machines, or Geolographs.

Pursuant to agreement for payment of a primary purchase price which is not here in controversy, title to the machines in existence passed immediately to the purchaser. As collateral, and to secure the promissory note given as evidence of the debt which was due as the primary payment, the purchaser gave the seller a mortgage on the machines in existence on the date of the sale. This gave rise to the contract language to which defendant would tie in the term "said Geolographs". That the expression had no relation thereto is plain from the writing which appears in the preceding paragraph as "machines (Geolographs)". The same writing does not appear in paragraph 7 (b), but instead the language reverts to the term "Geolographs", and the expression "said machines (Geolographs)" is not employed.

It is well to remember, also, that the contract has to do with the future as well as the past relations of the parties. In effect, the seller, after giving up title to the letters patent and the trademark, reserved a royalty interest in the promotion and use of the patented device. Such arrangements, either by grant or license, are not unusual where letters patent and trade-marks are involved. Thus, it does not stand to reason that the seller would have parted with the patent, and thereupon specified by contract that the royalty was to be paid during the life of said patent, when it was intended only that said royalty was to be paid on an expendable machine or machines. The contract in the separate parts which involve royalty payments or rentals expressly specifies as the term of payment "the life of said patent".

It is also persuasive that the testimony of record shows that if the parties were contracting for royalty on gross rentals of existing machines only, they had done an idle and futile thing by specifying what the royalty would be on rentals of $50,000 or more when it does not admit of dispute that such earnings could not have been in contemplation of the parties, when they contracted, if limited to the machines then in existence.

In effect, what defendant is asking the court to do in this lawsuit is to give the contract a strained and unnatural construction in order to import a consideration more favorable to defendant than that which is expressed in the contract. We are not impressed, and conclude that defendant is estopped. See Curtis v. Yale Oil Refining Co., 91 Okla. 93, 216 P. 433; Golden v. Golden, 155 Okla. 10, 8 P. 2d 42.

Reversed, with directions to enter judgment for plaintiff.

This court acknowledges the services of Attorneys A. Langley Coffey, Varley H. Taylor, and Henry L. Fist, who as Special Masters aided in the preparation of this opinion. These at-

torneys were recommended by the Oklahoma Bar Association, approved by the Judicial Council, and appointed by the court.

HALLEY, C.J., and WELCH, CORN, DAVISON, O'NEAL, WILLIAMS, and BLACKBIRD, JJ., concur.